In the Matter of Thomas J. Evans et al., Petitioners, against George P. Monaghan et al., Constituting the Board of Trustees of the Police Pension Fund, Respondents.

First Department, July 7, 1953.

*Murray A. Gordon, Barney Rosenstein* and *Daniel Jacobson* of counsel (*Doros & Gallione, Daniel Jacobson, Irving Mendelson, Robert J. Eliasberg,* attorneys), for petitioners.

*Victor J. Herwitz* and *Seymour B. Quel* of counsel (*Denis M. Hurley, Corporation Counsel,* attorney), for respondents.

BERGAN, J.   The charges upon which petitioners were dismissed from the police department by the commissioner after a trial before his deputy are essentially the same charges on

which they were previously acquitted by the commissioner. The central problem presented here is whether the prior determination dismissing the charges had such legal finality that it has become conclusive and is not open to the commissioner's re-examination.

That this double exposure to the loss by petitioners of their positions is not double " jeopardy " in the sense in which the Constitution affords protection was quite fully demonstrated at Special Term upon the denial of the motion to enjoin the commissioner from proceeding with the charges now reviewed (*McGillicuddy* v. *Monaghan*, 201 Misc. 650).

The charges of misconduct in office rest on the testimony of Harry Gross, a book-maker, that he paid the petitioners as police officers to protect him in his gambling enterprise and that he was protected by them.

Petitioners were cited as co-conspirators in the police protection of Gross by the Grand Jury of Kings County in an indictment returned May 8, 1951. They were not indicted for crime. Charges of accepting money to protect Gross and of protecting him on the basis of the indictment were made in the police department against petitioners and a third deputy commissioner to act as hearing officer was designated by the commissioner on October 18, 1951.

Gross, however, refused to testify and the hearing officer directed that the petitioners be sworn and be examined. Under oath they denied the charges. There was no evidence against the petitioners; the hearing officer found them not guilty on December 27, 1951, and recommended restoration to duty, which advice the commissioner followed by confirming the findings and restoring petitioners to duty.

Four months later, on April 23, 1952, the charges here reviewed were filed. These reiterated the accusations dismissed in December, 1951, and contained additional specifications of misconduct based on the falsity of the testimony of petitioners at the first hearing in which they denied receiving money from or protecting Gross in his gambling operations. On April 25th the commissioner appointed another third deputy to act as hearing officer.

Upon the hearing of these new charges Gross testified at great length to a multitude of details. His testimony occupies more than 450 pages of the printed record before us. If his testimony is credible the specifications of the charges against petitioners could be sustained. The hearing officer found the petitioners guilty on all of the specifications, including the falseness of

testimony given at the first hearing, and recommended their dismissal.

The commissioner, in his order, adjudged each petitioner " to be guilty of the charges and guilty of the specifications, and does convict him thereof," and determined that each petitioner be dismissed from the department.

Before the rule that a judicial determination once finally made is conclusive between the parties is applied with all rigor to an administrative determination affecting the right of continuance in public employment, we ought to examine the basis for this judicial policy which courts follow. The main reason for the policy treating adjudications as conclusive on the parties is that every workable system of law must find a way of ending the controversies it adjudicates. It is essential to the work of a judicial establishment that when a judgment is rendered with finality and authority, the parties are no longer able again to litigate the decided question.

The rule has never prevented the court itself from being moved to reopen the case and to re-examine the basis of its judgment for a cause which the court would regard as sufficient. While the judges developed a set of their own limitations on the sufficiency of the grounds which would move them to reopen, the rules related to the circumstances of exercise of power rather than to the power itself.

A rule of law which would always treat as an analogue to the judgment of a court the determination of an administrative officer in the discipline of public employees would have to have a guarded acceptance and be taken with some considerable reservation. The theory of the enlargement of the court rule of finality to take in administrative determinations is that the administrator has acted " judicially ", but that analogy in such a case rests very largely upon the fact that he conducts a hearing.

His determination of what to do about the charges, if he finds them sustained, is essentially an administrative function, for in that phase of his authority he carries out the duty to administer the public agency in the direction of the public service it performs.

If a court for reasons it regards as acceptable can re-examine its own judgments, conclusive though they may be on the parties, an administrator, for reasons which he deems acceptable and which on review a court can see to be reasonable, ought to have a similar privilege. It seems no answer to this that in the course of making his determination the administrator had to

sift and evaluate the facts and thus act "judicially". The analogy of the function of the administrator to that of a court ought to be kept within a reasonable area.

There are citable cases which suggest that finality follows an administrator's determination on the discipline of a public employee, but the vein of authority runs very thin. One of the grounds upon which the court at Special Term in *McGillicuddy* v. *Monaghan* denied an injunction restraining the hearing of the new charges in the case now before us was that the question of *res judicata* would be available in this proceeding for a direct review, and there was an intimation that the principle of *res judicata* would be applicable. On appeal to this court (280 App. Div. 144) the availability of this question on review was readily accepted and the order was affirmed, but there was an express disavowal of any attempt then to assess the merits of that question.

The language which is often quoted on this subject from *Osterhoudt* v. *Rigney* (98 N. Y. 222, 234), and which is printed in petitioners' brief, that the rule which forbids the reopening of a matter "once judicially determined" applies "as well to the decisions of special and subordinate tribunals" as to decisions of courts "exercising general judicial powers", must be read in a close application to the facts there before the court for decision and to the underlying cases on which the court there relied in making this general statement.

The court there had before it a taxpayer's action which sought to vacate audits of town accounts and to restrain the supervisors from levying taxes to pay these accounts as audited. The accounts had been received, passed upon and rejected by a prior town board.

The court was of opinion that the scheme of the statute for annual audit of accounts by town boards did not allow room for a revision of these audits by a subsequent board. "All the arrangements of the statute look to a summary and complete determination by the auditors" (p. 234). It was in this context that Judge ANDREWS wrote the language expressing the general similarity between judicial determinations of "special and subordinate tribunals" and determinations by courts of general jurisdiction.

The Reporter (Sickels) treated this statement as dictum (p. 222) for he prefaced it with the words "*It seems* that", by which contemporary Reporters then always gave warning to the Bar. When the two cases underlying the statement in the

opinion are resorted to, it will be seen why the precaution was deemed necessary. One is *Van Wormer* v. *Mayor* (15 Wend. 262); the other is *White* v. *Coatsworth* (6 N. Y. 137).

In *Van Wormer* v. *Mayor,* the board of health of Albany had directed the demolition of plaintiff's barn and sheds during the prevalence of Asiatic cholera in the summer of 1832, and the court at circuit had granted a nonsuit in an action against the city officers for trespass. The court was of opinion that the board of health had sufficient authority under a series of statutes to prevent the spreading of pestilential diseases and that for the purposes of the lawsuit the determination by the board that the structures were a nuisance and should come down would be accepted, and the defense they were not a nuisance but examined.

In *White* v. *Coatsworth* the prior adjudication deemed binding was made by a court in a summary proceeding to recover possession of real property. A jury had found that no rent was due. The landlord subsequently distrained property of the tenant to satisfy the same rent. It was held in the tenant's replevin suit that the prior adjudication on the same subject by a court of competent jurisdiction was conclusive against the landlord (p. 141). These cases give no support to the binding effect of judicial determinations of administrators. The board of health's order that structures regarded as a danger to public health come down had nothing whatever of a judicial cast about it; and the jury's determination in the summary proceeding was a judicial and not an administrative determination.

Other authorities relied on by petitioners do not add much strength to the argument. *Matter of Hyland* v. *Waldo* (158 App. Div. 654) turned upon the construction of a statute. The city charter provided that a policeman dismissed for conduct unbecoming an officer could not thereafter be reinstated. There a policeman was dismissed, but the question was re-examined by the police commissioner and he was reinstated. The civil service commission directed a redismissal on the ground that under the statute the policeman once discharged could not be reinstated, and on mandamus the court upheld the view of the commission. It is true enough that the opinion (p. 656) quotes from *Osterhoudt* v. *Rigney,* but the decision turned on the view of the court that relator had been " reinstated in violation of express provisions of law ". (P. 659.)

The question decided in *People ex rel. McCabe* v. *Matthies* (179 N. Y. 242) was procedural. The review by a claimant of a determination by a town board rejecting a claim was to be

by certiorari, the court held, rather than by mandamus, since the determination to reject the claim was treated as quasijudicial in character.

The Federal authorities discussed are not helpful. In *Dennison* v. *Payne* (293 F. 333) it was held that a determination by the Pennsylvania Workmen's Compensation Board allowing a claim for compensation in a railroad case, by holding that it arose in intrastate commerce in a proceeding in which both parties were represented, was a binding determination when in a later lawsuit in Federal court it was contended that the injury was sustained in interstate commerce. In *Durant* v. *Essex Co.* (7 Wall. [74 U. S.] 107) the court considered the binding effect of the judgment of a court, absolute in its terms, dismissing a suit in equity.

The decision by the Appellate Division, Second Department, in *Matter of Stowell* v. *Santoro* (256 App. Div. 934) is some authority for the argument pursued by the petitioners. Several charges were heard against the chief of police by the town board.

One of the specifications of the charges had been heard three years before by the board, and he had been acquitted. The court held that on this specification of the current charges he could not be convicted on retrial. The authority cited was *Osterhoudt* v. *Rigney*. On certain of the other charges the court confirmed the conviction and remitted the case to the board to fix the punishment as thus confirmed.

Respondent here argues from the record on appeal in *Matter of Stowell* that the original determination of acquittal was there fully on the merits and that a witness who testified at the second trial had been available but had not been called at the first hearing.

Whatever may be the differences between that case and the one now before us, we do not regard that decision based on *Osterhoudt* v. *Rigney* as a binding determination that an administrative officer may never re-examine a charge of official misconduct upon which he has once refused to remove a public employee, even though the ground for re-examination may appear to the officer to be proper and be regarded by a court as reasonable.

We do not hold that this kind of re-examination may be undertaken lightly or that a court will necessarily or always approve such a procedure, but where there seems solid and acceptable ground for re-examination, the power to do so ought not to be cut off by the court automatically and invariably.

In the case before us we think the terms of the 1951 indictment gave a basis for the charges in the first place; and their dismissal when the main witness refused to testify could scarcely be regarded as a determination on the merits as that term is commonly understood.

We would hesitate, too, to apply to this kind of a determination, involving discipline of public employees, the full effect of court judgments between litigating parties. The general rule has been stated that while the doctrine of *res judicata* applies to a judicial determination of a board or officer, it does not apply '' to a decision made while acting ministerially or administratively.'' Such a determination, if '' not recognized by the law of the forum as a judgment,'' is '' no bar to further proceedings in relation to the same matter '' (50 C. J. S., Judgments, § 606, p. 29).

Even in matters in which quasi-judicial determinations seem very close to decisions affecting the rights of adverse parties, such decisions sometimes have been treated by the court as not conclusive on those rights. Thus in an action against a public utility to recover excess charges for electricity resulting from plaintiff's use of one schedule rather than another on representations by the utility that there would be a saving, the filing by plaintiff of a claim for refund with the Public Service Commission and its rejection by the commission was not deemed a binding determination, although both parties seem to have been before the commission on the application (*Stern Bros.* v. *New York Edison Co.*, 251 App. Div. 379). The case is quite similar in principle to *Murphy* v. *New York Central R. R. Co.* (225 N. Y. 548).

We think, therefore, that the police commissioner was not precluded by a binding legal rule of estoppel, because of his dismissal of the charges after the refusal of a witness to testify, from reopening the charges when the testimony later became available, and we would not extend by analogy to this re-examination by the commissioner the rule of law which makes the judgment of courts binding on litigants.

Two other questions require our attention. One is whether the purported falsity of the testimony of petitioners on the first hearing can be a basis of specifications of misconduct under the current charges. In directing that petitioners testify over their objection, the first hearing officer did so on the theory that it was their duty to explain their acts to their superiors and he expressly preserved their right to decline to answer on the ground of self-incrimination.

Petitioners argue that the direction by the hearing officer to testify was unlawful and they cite *Martin* v. *O'Keefe* (195 App. Div. 814) and *People ex rel. Schauwecker* v. *Green* (96 App. Div. 249). But if petitioners are right in saying that they could not be required to testify, they should not have testified and thereby taken whatever risk a man usually takes that a court may later say that the course he followed was the wrong one.

Having undertaken to explain their conduct, they were obliged to make a truthful explanation. We agree with petitioners, however, that there is a substantial merger of the original charges of misconduct in office and the charges arising from their explanation of the misconduct. We would not sustain the charge of making a false explanation of the conduct unless we were prepared also to sustain the underlying charge itself (*People ex rel. Schauwecker* v. *Green, supra*).

The other question is whether the proof in support of the determination is substantial. In the end all the specifications of the charges depend on whether Gross is believed. It makes a hard case to take the word of a book-maker heavily pressed for official favor against the word of police officers.

But the hearing officer of the police department in weighing the testimony before him accepted the book-maker's version of the facts and reported his acceptance to the commissioner. The commissioner, who in turn has a general responsibility to the public and to the department itself to maintain police morale, accepting the report, regarded the testimony of Gross on which it was based as credible, and dismissed the petitioners from the service. On this judicial review we do not feel obliged to hold that the testimony of Gross, involving numerous transactions and events, is incredible as a matter of law, or that the commissioner was unreasonable if he believed and acted on that testimony. This ends our inquiry. We have no power to weigh the evidence. Our duty is to see whether on the record as a whole there is substantial evidence to support what the commissioner did. We do not regard the petitioners' complaints about the procedural course followed in the conduct of the hearing as presenting a substantial question.

The determination of the respondents should be confirmed.

DORE, J. P., and CALLAHAN, J. (dissenting). The petitioners have been tried twice in disciplinary proceedings on charges of misconduct as police officers. The first trial resulted in a dismissal of the charges after a full hearing, in which the petitioners were compelled to take the stand as witnesses.

Upon the decision of an earlier appeal in an action to restrain defendants from proceeding with the trial, we affirmed an order denying a motion for a temporary injunction and pointed out that injunctive relief would be improper because a complete and adequate remedy at law was available in the form of a review of the commissioner's determination (see 280 App. Div. 144). We refrained from passing on the merits of a proposed defense of *res judicata* at that time. Our prior decision, however, in no way precludes us from considering the merits of such defense at this time. When the injunction was sought, it was found necessary to have developed whether there was identity in the charges involved upon the two trials. Such identity is now conceded.

It is our view that the rule of *res judicata* that forbids the reopening of a matter once judicially determined should preclude the commissioner from trying the petitioners again. That rule applies as well to decisions of special and subordinate tribunals acting judicially as to decisions of courts exercising general judicial powers (*Osterhoudt* v. *Rigney*, 98 N. Y. 222, 224).

Nor does the application of this rule depend solely upon the authority of *Osterhoudt* v. *Rigney* (*supra*). It is a generally accepted principle of law (*Johnson* v. *Towsley*, 13 Wall. [80 U. S.] 72, 83; *People ex rel. McCabe* v. *Matthies*, 179 N. Y. 242, 248).

In 2 Freeman on Judgments (§ 633) it is said: " Nevertheless, the principle of the conclusiveness of prior adjudications is not confined in its operation to the judgments of what are ordinarily known as courts, but it extends to all bodies upon whom judicial powers have been conferred. Whenever any board, tribunal or person is by law vested with authority to judicially determine a question, such determination, when it has become final, is as conclusive as though the adjudication had been made by a court of general jurisdiction."

The power and duty to try and judicially determine the question of guilt or innocence of the charges of misconduct in office of a police officer as it relates to his tenure of office have been delegated by law to the police commissioner (N. Y. City Charter, § 434; Administrative Code, § 434a-14.0). Although Judge RIFKIND in the prior proceeding acting as deputy police commissioner found some of the respondents before him guilty, he expressly stated with respect to all petitioners herein: " With respect to the following respondents there is no evidence of guilt or complicity in the illegal activities of Harry Gross. I find each of them not guilty." His adjudication is as con-

clusive as would be a determination by any court given plenary power to determine like issues.

We have already said with respect to another branch of the proceedings that they were judicial in nature (*Matter of Delehanty* [*Sullivan-Goubeaud*], 280 App. Div. 542).

The rule of *res judicata* has been applied to the departmental trials of police officers in the past (*Matter of Hyland* v. *Waldo*, 158 App. Div. 654; *Matter of Stowell* v. *Santoro*, 256 App. Div. 934).

The only occasion for a second trial in this case is the fact that one Harry Gross, whose connections with the alleged dereliction in duty involved in the first proceeding was fully known at the time of the first trial, apparently refused to testify on the first trial, but indicated a willingness to do so after the petitioners had been acquitted, and after he had later learned at his sentence in the criminal trial that he could get " consideration " if he testified in the police trials. Thus, in the present case we do not have a state of facts involving newly discovered evidence. This court has heretofore held on two occasions, even though newly discovered evidence was available to the police commissioner, that no power existed to grant a new trial (*People ex rel. Cohen* v. *York*, 43 App. Div. 138; *People ex rel. Padian* v. *McAdoo*, 114 App. Div. 100). In the *Cohen* case (*supra*) this court indicated that it found considerable merit in the new evidence offered by the police officer, but still denied him the power to order a new hearing. It would seem elemental justice to afford protection against repeated trials in the event of acquittal.

In deciding the present charges the trial commissioner suggested, and the majority of this court are apparently agreeing with his view, that there is a public policy against affording the benefit of this rule of *res judicata* to police officers guilty of serious acts of misconduct.

The public policy basis of the rule of *res judicata* is set forth by 2 Freeman on Judgments (§ 626), in the following language: " A judgment is a bar, not because a party has done some act which precludes him from asserting a right or title; it is properly a bar on principles of public policy, because the peace and order of society, the structure of our judicial system, and the principles of our government require that a matter once litigated should not again be drawn in question between the same parties or their privies. The doctrine of *res judicata* rests on the two maxims that ' A man should not be twice vexed for the same cause,' and that ' it is for the public good that there be an end

to litigation.' A party whose interests are placed in jeopardy by a trial has a right to judicial immunity from the consequences of further trials involving the same issues. * * * ' The rule of res judicata does not rest wholly on the narrow ground of technical estoppel nor on the presumption that former judgment was right and just, but on the broad ground of public policy that requires a limit to litigation, * * * Like the statute of limitations, it is a rule of rest.' ''

In our earlier decision in the *Sullivan* case (*supra*) we noted that the charges involved allegations of criminal misconduct by the police officers. While the present proceedings are not criminal actions in form, they involve charges of the commission of crimes and entail results that are disastrous to the persons so charged. The rule of *res judicata* should afford protection of the same nature as that afforded against double jeopardy.

In his report to the police commissioner, the deputy trial commissioner, in the present appeal, with regard to the rule of *res judicata,* stated: '' In substantial degree the rule has been applied to administrative procedures ''. However, he placed his denial of the applicability of that rule to the case before him on the ground that the public policy '' which decrees an end to relitigation of an issue once decided '' should yield to '' the public policy which requires elimination from the ranks of the protectors of public order of those who in fact are violators of the law.'' Accordingly, while he could find no controlling authority '' which fits the facts of this case '', he, nevertheless, held that because of the above considerations, it was his '' view that the Police Department may revive charges against its members though once tried when even the defects in earlier proof were substantial and have now been overcome.'' If we confirm this determination, we affirm a doctrine for which no authority other than the trial commissioner's '' view '' is adduced. Consider the consequences of confirming this '' view ''. If the police department may revive charges against its members after being '' once tried '' and again try the same charges between the same parties on the same issues, not on newly discovered evidence but on evidence that was fully known at the time of the first trial, why in reason and logic may not the department on this theory revive charges a third, fourth or a fifth time after they have been previously tried? The effects of the application of such a doctrine on the security, tenure and morale of the personnel of the police department can easily be foreseen. We think this wholly novel and wholly unsupported view of the trial commis-

sioner is opposed to the firmly settled public policy of the State. That public policy is rooted in a principle tested by experience in the application of the law in the civilized countries of the West for centuries, viz., that in the long run " the community " to which the trial commissioner so frequently referred, and all its members are best protected and best served by denying relitigation of issues once decided. Only thus can we avoid judicial or administrative oppression. From ancient Roman law itself our jurisprudence has accepted the maxim. " *Interest rei publicae ut sit finis litium.*" The public interest would be no more affected by granting this protection than it is by affording one charged with crime from repeated jeopardy.

2 Freeman on Judgments (§ 628), states: " There is no logical or legal basis, either on grounds of public policy or otherwise, for the claim that the nature of the matter determined may be such that a judgment adjudicating it will not be treated as conclusive though contrary to the law and the facts. This is true even in cases involving the public rights * * *.''

We have not attempted to discuss separately the added specifications for perjury and fraud in the charges made upon the second trial, because the majority concede that they would not uphold these charges, unless they were sustaining the underlying charges and overruling the defense of *res judicata*.

It is apparent that the majority has been impressed by Gross' statements as to the claimed enormity of his gambling enterprises and the belief that such widespread gambling could not prevail without police connivance. But the majority also must depend on Gross' testimony alone as to the size as well as the existence of his gambling enterprises. To permit him thus to obtain credit by this method is to yield to the familiar pattern of the " big lie " when used by a criminal instead of by a propagandist. Such methods should be rejected by a court of law where guilt must be established by credible proof.

It is conceded that the only proof offered to sustain the serious charges made against all these petitioners was the uncorroborated oral testimony of one Harry Gross, a claimed alleged accomplice, who by his own admission is a man whose sole activity for many years was widespread commission of crimes; one who confessedly made crime his business and lived on its proceeds by, he claims, widespread bribery and corruption on his part of public officials. He had no memoranda or records; he said he always destroyed his records shortly after they were made; he used no notes and his testimony involved not only the present petitioners but many others in the police department

against whom no charges appear. A reading of the record indicates that he did not testify " forthrightly " as the Trial Commissioner found, but glibly and apparently even boastfully enjoying the important position that he conceived himself to occupy from which, merely by his oral say-so, he could strike down any policeman against whom he saw fit to make charges of taking bribes from him. Thus he testified to bribery of patrolmen, captains, lieutenants, inspectors and " divisions ". Not as a penitent criminal seeking sincerely to make amends for a confessed life of crime did he appear before the Trial Commissioner. The reason that he first gave for refusing previously to testify, namely, regard for the families of the accused, was destroyed by his own later admissions. When asked to tell why he had repeatedly refused to testify before Judge RIFKIND and at the request of the Corporation Counsel, he answered as follows: A. " Counselor, I was never talked to; I was — nobody come to see me. Nobody said a word. I was taken out of Rikers Island; I was put in a van; I was brought down here; my name was called out; I took the stand, and in my own knowledge I thought I was doing what I — I was protecting myself for. Whatever plan the District Attorney might have had, or the Corporation Counsel, I didn't know. It wasn't discussed with me. Nobody told me what could be done for me or what — how I could help myself or anything else." He then added that the only time he found out he " could help myself " was at his sentencing when he was assured that he would get " consideration " if he testified " in these police trials ". In answer to a question as to whether he was told a recommendation would be made for leniency for him if he did so testify, he answered that the Corporation Counsel would make the recommendation and go along with the District Attorney's recommendation " which he had said at my sentencing." He was then asked and answered as follows: " Q. What prompted your talking now? A. That, yes, I hope to get consideration."

For his book-making activities he had received a twelve-year jail sentence and in addition five years for contempt of court. After having tested for some time the actual effect of jail including, he claims, five months in solitary confinement, the motives of his testifying in these police trials should be obvious. What is implicit in many cases is admitted explicitly here: Gross is trying to help Gross to reduce his own jail sentence.

In a similar case in which a police commissioner of the city of New York had removed police officers on the sole testimony

of a witness who was a self-confessed criminal and "an unsavory character" this court annulled the determination of the police commissioner and held that it was "unsupported by any credible evidence." (*Matter of Reger* v. *Mulrooney,* 241 App. Div. 38, 44). The question then presented to this court is essentially the same issue as is now presented. The majority of this court in its present opinion admits: "In the end all the specifications of the charges depend on whether Gross is believed. It makes a hard case to take the word of a bookmaker heavily pressed for official favor against the word of police officers." On us, therefore, rests the serious obligation to determine whether members of the police force of long and honorable service (here upwards of twenty to thirty-two years), of unblemished reputation, may be struck down and dismissed on the unsupported and wholly uncorroborated testimony of a witness such as the sole witness on which the prosecution and the trial commissioner relied. Especially heavy is that burden when the self-seeking motives of such a witness are patent and confessed. On the state of facts presented, we think we should say as this court said in the *Reger* case (*supra,* p. 44): "This court will not permit a finding of guilt and dismissal of the petitioners to stand upon the testimony given before the police commissioner."

In *People ex rel. Kelly* v. *Waldo* (161 App. Div. 731, 732) in reversing the dismissal of a policeman from the force on the uncorroborated testimony of one person, against the denial of the police officer of the receipt of an alleged bribe, the Second Department, annulling the police commissioner's determination and reinstating the relator, said: "The relator denies absolutely his receipt of any money. The alleged act was a misdemeanor (Penal Law, § 855), and the relator was entitled to 'the presumption that he was innocent of the charge * * * so that even if the proof was otherwise evenly balanced, this presumption might properly prevail with the police commissioner in favor of the complainant.'" In the *Kelly* case as in the case before us, the charge involved criminality. While technically section 399 of the Code of Criminal Procedure may not be formally applicable, the basic reason for its salutary purpose should in fairness and justice be not lost sight of in police trials upon charges involving criminality.

The falsity of Gross' testimony with respect to Inspector McGillicuddy's claimed arrangement with Gross to let him "finish the day" and "to put a stiff in there the following day" was demonstrated by documentary evidence, the police

department records which showed that the arrest in question was made the same day the report was received.

In *People ex rel. Hussey* v. *Woods* (169 App. Div. 146) in annulling dismissal of a police officer, the Second Department said at page 148: " Who then, should be believed, the criminal accuser, or the man of good repute and character, apparently good? I do not need to use the expression ' presumption of innocence,' which is associated so intimately with criminal trials, although there is full authority for employing it. (*People ex rel. Kelly* v. *Waldo,* 161 App. Div. 731.) But there is at least the presumption that Hussey was an honest man. As such, his testimony must be preferred to that of a dishonest man — a criminal, who could only escape by accusing another.''

In a very recent case in which this court reversed the police commissioner's dismissal of a police officer on most serious charges supported, however, only by the uncorroborated testimony of one witness, this court said (*Matter of Di Nardo* v. *Monaghan,* 282 App. Div. 5): " Indeed, in the circumstances of the present case, the absence of any evidence to support the charge except the testimony of the prosecutrix and the total absence of any corroborative proof are the omission of a vital safeguard against the likelihood of manifest and gross injustice and irreparable damage, and amount to dispensing with an essential element of a fair trial.''

While the majority must and does recognize that ordinarily the rule of *res judicata* applies to administrative quasi-judicial proceedings especially where, as here, alleged criminality is involved, nevertheless the majority opinion seems to make an exception of this case on the ground that " re-examination may appear to the officer to be proper and be regarded by a court as reasonable.'' On the above facts and authorities above cited, we think there is no reasonable basis for such exception.

The determination should be annulled, the proceedings dismissed and petitioners reinstated.

Cohn and Breitel, JJ., concur with Bergan, J.; Dore, J. P., and Callahan, J., dissent and vote to annul the determination, dismiss the proceedings and reinstate petitioners, in opinion.

Determination confirmed, with $20 costs and disbursements to the respondents.