In the Matter of STEVEN M. BERENHAUS, Petitioner, v BENJA-
MIN WARD, as Police Commissioner of the City of New
York, et al., Respondents.

First Department, July 1, 1986

## APPEARANCES OF COUNSEL

*Raymond E. Kerno* of counsel *(Richard Hartman,* attorney), for petitioner.

*Susan Elsen* of counsel *(Francis F. Caputo* and *Norma Kerlin* with her on the brief; *Frederick A. O. Schwarz, Jr., Corporation Counsel,* attorney), for respondents.

## OPINION OF THE COURT

MURPHY, P. J.

At the time of his departmental trial on charges of appropriating evidence to his own use and possession of a controlled substance, petitioner Steven Berenhaus was a 15-year veteran of the police force with a spotless disciplinary record and a long list of commendations and awards for distinguished service including one honorable mention, one commendation, 10 awards for excellent police duty, and, after being shot and seriously wounded in the line of duty, the Combat Cross, the second highest decoration awarded by the Police Department.

The witness, on whose completely uncorroborated testimony petitioner was found guilty as charged and dismissed from the force, was one Thomas Peteroy. Peteroy, as he himself admits and all others concerned acknowledge, is a "rogue cop". At petitioner's hearing, Peteroy admitted to being a compulsive gambler and an occasional drug abuser who supported his gambling habit by repeatedly betraying the trust placed in him as a police officer to steal from parked cars, from businesses and residences to which he went to investigate burglaries, and from the employer for whom he illegally moonlighted. He also admitted to accepting protection money on a regular basis from tow truck operators and "after hours" club proprietors. It was this latter practice for which Peteroy was eventually arrested in 1982. After his arrest, and in anticipation of his imminent conviction for conspiracy to violate the Hobbs Act, Peteroy began to cooperate with Federal authorities who

indicated that his cooperation would be taken into account at the time of his sentencing.

It was in June 1983, while cooperating with the United States Attorney's prosecution of a police officer named Alfano, that Peteroy implicated petitioner. During Alfano's trial, petitioner, who had been Alfano's patrol partner, was subpoenaed as a defense witness to testify as to Alfano's whereabouts. The prosecutor, seeking to discredit petitioner's testimony, inquired of Peteroy whether he knew of any misconduct by petitioner which could be used for impeachment purposes. Peteroy then disclosed for the very first time that in March 1981 he gave petitioner a small amount of marihuana from a bale of the substance seized as evidence following the conclusion of a police drug operation.

Some five months later, in November 1983, Peteroy's revelations gave rise to the charges of which petitioner now stands accused. Petitioner's hearing on the charges took place in February 1984, nearly three years after the events disclosed by Peteroy.

At the time of the hearing, Peteroy was awaiting sentencing upon his Federal felony conviction for conspiracy to violate the Hobbs Act. He testified that on the night of March 24th and early morning of March 25, 1981 he was on duty as a switchboard operator at the front desk of the 10th Precinct. At about 11:45 P.M., petitioner and several other officers brought in two drug dealers they had apprehended along with three bales of marihuana and a large quantity of cash seized in connection with the arrest. When two of the arresting officers became embroiled in an argument, Peteroy took advantage of the opportunity to leave his post unnoticed and go to the nearby lieutenants' room where the seized bales of marihuana had been placed. On noticing a small hole in the burlap covering of one of the bales, Peteroy left the lieutenants' room to retrieve a small paper bag from a wastebasket. He then returned and placed two handfulls of marihuana in his bag. According to Peteroy, as he placed the marihuana in the bag, petitioner entered the room and said he could "use" some of the marihuana. Peteroy told petitioner that he would give him some if petitioner got his own bag. Petitioner allegedly obtained a bag and was given some marihuana. Peteroy claimed that as late as June 1983 he still possessed some of the marihuana he had taken for himself, and that he turned this over to the investigative authorities. Expert testimony established that, while the substance turned over by Peteroy

was in fact marihuana, there was no way of determining whether it came from the bales seized on March 24, 1981.

Petitioner testified that, although he might have seen Peteroy at some point during the night in question, he never encountered Peteroy in the lieutenants' room and was never offered or came into possession of any of the seized marihuana. As petitioner remembered the subject events, he returned to the precinct after the arrest and a short time later went to his locker to change into civilian clothes. He recollected leaving directly thereafter at about 12:25 A.M. The precinct sign-out sheet indicated that he left at 1:00 A.M.

Petitioner also testified to a long history of poor and malicious relations between himself and Peteroy. He stated that he disliked Peteroy's sarcastic manner and was offended by anti-Semitic remarks which Peteroy was given to make. These general grounds for petitioner's dislike of Peteroy were sharpened by Peteroy's assignment of petitioner to New Year's Eve duty on two occasions despite the fact that both years the holiday coincided with petitioner's regular day off. Petitioner also recalled an incident in which Peteroy failed to come to his aid in restraining an emotionally disturbed individual who later had to be hospitalized. During the incident, Peteroy was allegedly parked in his patrol car about 100 feet away in front of an after hours club from which he received protection money. Petitioner testified that he had had a heated exchange with Peteroy over this matter. So poor were the relations between the two men that, when Peteroy shot himself in the foot while moonlighting, petitioner went out of his way to call him a "stupid bastard". In a similar vein, Peteroy did not visit petitioner in the hospital after petitioner was shot and seriously wounded in the incident for which he was awarded the Combat Cross.

In his decision, the Assistant Commissioner of Trials noted that his determination as to petitioner's guilt or innocence turned on whether he accepted petitioner's or Peteroy's account of the subject events, and acknowledged that "Peteroy can only be characterized as a rogue cop, who long ago gave up any intention to honor his duty to enforce the law", but concluded nevertheless that it was Peteroy's account which should be credited. The Assistant Commissioner supported this conclusion by noting that Peteroy testified with candor about his "long list of misdeeds". Peteroy's motive to fabricate testimony against petitioner so as to impress the United States Attorney and thereby reduce his impending sentence

was discounted since his cooperation in Federal matters only was to be considered at sentencing. Also discounted in the Assistant Commissioner's assessment of Peteroy's credibility was the long-standing animosity between Peteroy and petitioner. The Assistant Commissioner opined that Peteroy did not have "so much" animosity toward petitioner as to want to destroy his career. Peteroy, it was ventured, actually tried to shield petitioner whom it will be recalled he only implicated belatedly. Finally, the Assistant Commissioner found that Peteroy's credibility was enhanced by his declaration against his penal interest to the effect that he assisted in petitioner's theft of the marihuana.

Petitioner's testimony, on the other hand, was deemed untruthful because of his demeanor and his sometimes sketchy recollection of the March 1981 events. Great importance was placed upon the half-hour discrepancy between the time petitioner testified to leaving the precinct and the time indicated on the sign-out sheet.

Finding petitioner guilty as charged, the Assistant Commissioner recommended that he be dismissed from the force. The severe penalty was said to be warranted since petitioner had committed acts constituting the crimes of petit larceny (Penal Law § 155.25), tampering with physical evidence (Penal Law § 215.40), and unlawful possession of marihuana (Penal Law § 221.05). The Assistant Commissioner's recommendation was approved by Police Commissioner Benjamin Ward on September 5, 1984.

The question with which we are posed in the within CPLR article 78 proceeding transferred to this court for disposition by Special Term pursuant to CPLR 7804 (g) is whether the Commissioner's determination as a result of the hearing held, is, on the entire record, supported by substantial evidence. (CPLR 7803 [4]; *Matter of Pell v Board of Educ.,* 34 NY2d 222 [1974].) While recognizing that the scope of our review is narrow *(ibid.)* and does not permit the overturn of an administrative determination rationally based upon the record as a whole, we find the present determination so devoid of reliable evidentiary support and shocking to basic notions of fairness as to require annulment. Substantial evidence is not a euphemism for little evidence or no evidence; there must still be "proof sufficient to satisfy a reasonable man, of all the facts necessary to be proved in order to authorize the determination" *(Matter of Weber v Town of Cheektowaga,* 284 NY 377, 380). We can find no such proof in this case.

At the outset, we note that petitioner's guilt was established in exclusive reliance upon the uncorroborated testimony of an accomplice. There is no other evidence directly or even circumstantially connecting petitioner with the charged misconduct. Respondent correctly points out that corroborative testimony essential in criminal proceedings (CPL 60.22; *see also,* former Code Crim Pro § 399) is not generally required in administrative hearings which are deemed civil in nature *(Matter of Evans v Monaghan,* 306 NY 312; *Matter of Sowa v Looney,* 23 NY2d 329). Yet, as has been observed, "While technically section 399 of the Code of Criminal Procedure may not be formally applicable, the basic reason for its salutary purpose should in fairness and justice be not lost sight of in police trials upon charges involving criminality." *(Matter of Evans v Monaghan,* 282 App Div 382, 396 [Dore, J.P., and Callahan, J., dissenting] [as cited by the majority in *Matter of Evans v Monaghan,* 306 NY 312, 319-320, and *Matter of Kelly v Murphy,* 20 NY2d 205, 208].) Judicial confidence in the essential soundness of an administrative determination may sometimes require evidence corroborative of incriminating testimony, particularly where, as here, the testimony is that of an accomplice with a long history of self-dealing, dishonesty and criminality, and the charges when sustained result, as they have in this case, in express findings of criminal conduct. The need for corroborative evidence in a case such as the one before us is nothing more than the need for substantial evidence. Were we to settle for less it would be an abdication of our judicial function which requires that we base our determination as to the substantiality of the evidence upon the whole record, necessarily including in our consideration any facts from the record fairly diminishing the strength of the evidence underlying the administrative determination. *(Matter of Kelly v Murphy, supra,* at p 209; *see also, Universal Camera Corp. v Labor Bd.,* 340 US 474, 487 [Frankfurter, J.].)

The cases cited by respondent do not hold to the contrary. *Matter of Evans v Monaghan (supra,* at pp 319-320) expressly acknowledges the need for some corroboration of accomplice testimony so as to command judicial confidence in its veracity. Any doubts in this regard should have been put to rest by the Court of Appeals decision in *Matter of Kelly v Murphy (supra)* where the same Judge who authored *Evans* (Van Voorhis, J.), observed:

"In the *Evans* case the circumstances lending credence to the testimony of the complaining witness were held to consist

in the proven accuracy of much of his testimony regarding details that were not, in themselves, incriminating, and in the magnitude of his gambling operations within the areas of command of the police officers combined with the almost complete absence of action taken by them to enforce the gambling laws against him.

*"No such corroborating circumstances exist here." (Matter of Kelly v Murphy, supra, at p 208; emphasis added.)*

The other Court of Appeals case cited by respondent for the proposition that corroborative evidence is invariably unnecessary to sustain an administrative determination is *Matter of Sowa v Looney* (23 NY2d 329). Yet, a reading of that case discloses that there the complaining witness' account was in fact supported by detailed circumstantial corroboration *(supra, at p 336)*. More importantly, however, the complaining witness in *Sowa*, a victim of sexual molestation, was not an accomplice and possessed neither a motive to lie nor a proven record of dishonesty.

The record in the present matter presents circumstances contrasting sharply with those in *Evans (supra)* and, as noted above, *Sowa (supra)*. In *Evans*, the complainant's largely confirmed testimony as to his widespread gambling enterprise was sufficiently detailed and voluminous, running some 450 pages in length, as to lend credence to his allegations of police misconduct. Moreover, the accused officers in *Evans* did not present witnesses for the purpose of refuting the complainant's account even though such witnesses were available and, it must be supposed, would have been called upon had their testimony been deemed helpful. *(Matter of Evans v Monaghan, supra, at p 321.)* Here, on the other hand, Peteroy's testimony as to the events of the night in question was narrowly confined in scope and was neither so detailed nor of such unusual substance as to command belief for the reasons advanced in *Evans*. Further, the misconduct to which Peteroy testified at petitioner's hearing was not, as in *Evans*, widespread and conspiratorial in nature implicating others who might be called upon for refutation. Rather, it was brief, discrete, and isolated, susceptible to confirmation or refutation by the two alleged participants only. Apart from Peteroy's testimony, there was no other evidence, circumstantial or otherwise, of petitioner's guilt.

The Assistant Commissioner's decision to credit Peteroy's testimony is simply insupportable. That Peteroy testified

truthfully to a career of unscrupulous conduct would hardly seem to enhance his credibility. A past riddled with dishonesty, even when candidly acknowledged, cannot be cited, as it was by the Assistant Commissioner, in support of a witness' capacity for truth telling. Were such a patently irrational inference to be allowed, those such as petitioner, with no prior record of misconduct to confess in a purported demonstration of candor, would be at a disadvantage that can only be described as Orwellian.

Similarly, the fact that Peteroy as an admitted accomplice in the alleged misconduct testified against his penal interest cannot reasonably be exalted into a ground for accepting his uncorroborated testimony as true. All accomplice testimony is against penal interest, yet that alone does not render it worthy of belief. To the contrary, the admissions of an accomplice against penal interest, occurring as they do in the course of testimony given against the accomplice's partner in crime, cannot fail to raise serious questions of credibility. The very real possibility that the testimony has been fabricated to promote the accomplice's self-interest, may not be lightly discounted. It is for this reason that accomplice testimony must be independently corroborated in criminal proceedings (CPL 60.22; *People v Hudson,* 51 NY2d 233, 238). Although, as noted above, the corroboration requirement is not strictly applicable in administrative proceedings, its underlying rationale may not be lost sight of *(cf. Matter of Evans v Monaghan, supra,* at p 396; *Matter of Kelly v Murphy, supra,* at p 208). Where administrative proceedings involve criminality it is at the very least undesirable to premise a finding of guilt upon uncorroborated accomplice testimony; the error is, however, compounded when, as in this case, such testimony is deemed credible for the highly suspect admissions from which it is necessarily woven.

The motive for fabrication in this case was glaring and should not have been so easily dismissed by the Assistant Commissioner. His conclusion that Peteroy's animosity was not so great as to prompt the destruction of petitioner's career finds little support in the record, which discloses a bitter and long-standing enmity between the two men evidenced not merely by bad feeling but also by conduct showing open and malicious disregard by each party for the health and safety of the other. At the very least, Peteroy would not have been sentimentally deterred from fabricating allegations against petitioner if the opportunity for selfish gain were to arise.

Such an opportunity did arise during the Federal prosecution of Alfano. It cannot be stressed too strongly that Peteroy's disclosures leading to the present charges against petitioner were made in the course of his cooperation with the United States Attorney in a Federal proceeding. As Peteroy had been promised that his cooperation in the Federal proceeding would be considered at the time of his sentencing for conspiracy to violate the Hobbs Act, the motive for fabrication is obvious. The Assistant Commissioner's belief that this motive could be discounted because Peteroy's testimony before him was offered in a non-Federal forum is artificial in the extreme. The facts cannot be so easily ignored. Having originally made the present allegations against petitioner in response to the inquiry of the United States Attorney concerning petitioner's prior bad acts, it cannot be realistically supposed that Peteroy, whose sentencing at the time of petitioner's hearing was a brief month away, would, under oath, contradict the account he had previously provided the Federal authorities. To do so would have rendered his cooperation in pursuit of leniency largely useless.

Given Peteroy's clear motive for fabrication, his complete lack of regard for petitioner, and his sordid past of unscrupulous self-dealing, we find it impossible when fairly reviewing the record as a whole, to sustain the determination as to petitioner's guilt on his testimony alone, which is in all material respects unverified and, it would appear, unverifiable. Peteroy's unreliability is fatal to respondent's case and is not somehow compensated for by petitioner's less than perfect recollection of the events of the night in question. It must, in any case, be remembered that the charges against petitioner were not made until some 2½ years after the subject misconduct is said to have occurred and that the hearing was not held until yet half a year more had passed. Clearly, some degree of mnemonic uncertainty is to be countenanced under these circumstances.

Finally, were we not annulling the Commissioner's determination outright, we would, nevertheless, find it necessary to remand the matter for reconsideration of the penalty which is shockingly severe. Petitioner has served as a police officer for more than 15 years with uninterrupted distinction. We cannot ignore, as did the Assistant Commissioner, that in addition to his other commendations and awards petitioner received the Combat Cross for an incident in which he nearly lost his life. Surely, so distinguished a career is not to be irreparably

destroyed on the basis of the case here made by respondent. Even if the evidence adduced were substantial, which it is not, the penalty imposed is, in light of all the circumstances, disproportionate to the alleged offense and would require amelioration upon remand if the within petition were not to be granted.

Accordingly, the determination of the Commissioner of Police, Benjamin Ward, dated September 5, 1984 confirming the recommendation of the Assistant Commissioner of Trials that petitioner Steven M. Berenhaus be found guilty of appropriating evidence to his own use and possessing a controlled substance, and that petitioner as a consequence be dismissed from the New York City Police Department, should be unanimously annulled, on the law, without costs, and the petition granted.

KUPFERMAN, Ross, MILONAS and ELLERIN, JJ., concur.

Determination of respondent Commissioner dated on or about September 5, 1984 unanimously annulled, on the law, without costs and without disbursements, and the petition granted.