In the Matter of RICHARD FARRY, Petitioner, v BENJAMIN WARD, as Police Commissioner of the City of New York, et al., Respondents.

First Department, February 24, 1987

**APPEARANCES OF COUNSEL**

*Carol Mellor* of counsel *(Joseph Fallek, P. C.,* attorney), for petitioner.

*Paul Marks* of counsel *(Larry A. Sonnenschein* and *Nicole A. Gordon* with him on the brief; *Frederick A. O. Schwarz, Jr., Corporation Counsel,* attorney), for respondents.

**OPINION OF THE COURT**

MURPHY, P. J.

After having been adjudged guilty in an administrative proceeding of possessing stolen property and of failing to take proper police action when he became aware that officers under his command had removed property from the scene of a past burglary, Sergeant Richard D. Farry, petitioner herein, was dismissed from the police force. We are now called upon to determine whether the administrative findings of guilt upon which petitioner's dismissal was based are supported by substantial evidence as they must be to pass judicial muster pursuant to CPLR 7803 (4).

The source of the allegations against petitioner, as well as the testimony implicating him in the charged misconduct, was an officer named Thomas Peteroy. Peteroy testified as follows: At 4:46 on the morning of January 24, 1981, he and his partner, Officer Gillott, received a radio transmission from Sergeant Grice. Grice requested that Sergeant 2 (Farry) provide him with backup at the scene of a burglary which had occurred at the Rosenstock Oldsmobile dealership garage, located at 440 West 19th Street in Manhattan. Peteroy and Gillott responded at once. They drove in their patrol car from 18th Street and 9th Avenue where they received the radio transmission, to the nearby garage in a matter of minutes, arriving no later than 4:50 A.M. There they found Sergeant Farry and his driver, Officer Pizzo, waiting for them. Sergeant Grice, whose request for backup prompted their presence at Rosenstock was not there, and he played no part in the ensuing events. The four officers, leaving their patrol cars unattended in the street, proceeded to search the Rosenstock premises for burglars, starting with the second floor. They found that it had been thoroughly ransacked; windshields of the cars parked there had been shattered, dashboards vandalized and radios removed. After surveying the damage for about 10 minutes, the officers went downstairs. On reaching the street, Peteroy and Pizzo encountered a man who reported

that he resided nearby and had heard a disturbance coming from the roof of the Rosenstock premises at about 1:30 that morning. When their conversation with this man ended, Peteroy and Pizzo joined Farry and Gillott in the lower level service area and, together, the officers resumed their search. Finding no burglars in the service area, they entered the cashier's office. Again, no burglars were found but evidence of their intrusion was not wanting. Drawers and file cabinets had been opened and their contents strewn everywhere. Papers and human excrement covered the floor. The officers then entered the parts department through an unlocked door connecting it with the office area. No burglars were found there either. Their search of the downstairs thus concluded after between 10 and 15 minutes, the officers, while still in the parts department, conferred as to which parts they could use. They then started moving the items they had decided to take from the parts department to the service area. Sometime during this process, petitioner telephoned the precinct but, nevertheless, had time to help his companions transport some batteries and cases of oil. Once the officers had stacked eight batteries, several cases of oil, and varying unspecified quantities of oil filters, air filters, antifreeze, spark plugs and ratchets just outside the office in the service area, Peteroy and Gillott unlocked and opened the garage door and Pizzo backed Sergeant Farry's patrol car into the service area so that the merchandise could be loaded conveniently into its trunk. After the trunk was loaded, Peteroy and Gillott moved a car from the second floor and placed it up against a swinging garage door on the first floor to keep it closed securely. On their way back to the service area, Peteroy and Gillott encountered an employee of ADT Security Systems, who had just arrived on the scene. ADT installed, maintained and monitored the burglar alarms on the Rosenstock premises. The police left shortly after the ADT employee's arrival and went to a lot where the stolen merchandise was placed in Officer Gillott's van. Subsequently, the officers met, divided the items and transferred them to their private vehicles. Peteroy later sold a number of the stolen batteries to customers at the gas station where he moonlighted. He transferred the sale proceeds to his fellow officers, including petitioner.

The Assistant Commissioner of Trials (ACT) credited the foregoing account and on that basis, found petitioner guilty of the charged misconduct. Of course, as our dissenting colleague notes, it is the special province of the trier of fact to weigh a

witness' testimony and determine whether it is to be credited. This is because the trial court is uniquely positioned to observe the witness and thereby to assess his or her capacity for truth-telling. There are cases, however, where the trier of fact is not free to base its ultimate determination solely on testimony it might find believable. Thus, in a criminal prosecution, the testimony of an accomplice is not a sufficient basis for a conviction; the accomplice's allegations of wrongdoing must be corroborated (CPL 60.22; *People v Hudson,* 51 NY2d 233, 238). As we have elsewhere noted *(Matter of Bernhaus v Ward,* 118 AD2d 196), although the corroboration requirement is not generally applicable in administrative proceedings which are deemed civil in nature, there are, nevertheless, circumstances where inculpatory testimony given in an administrative forum must be corroborated *(supra,* at p 201; *see also, Matter of Evans v Monaghan,* 306 NY 312, 319-320; *Matter of Kelly v Murphy,* 20 NY2d 205, 208). The need for corroboration in such circumstances stems from the need for substantial evidence, aptly described as "proof sufficient to satisfy a reasonable man, of all the facts necessary to be proved in order to authorize the determination". *(Matter of Weber v Town of Cheektowaga,* 284 NY 377, 380.) Put somewhat differently, the record as a whole must contain reliable evidence sufficient to warrant judicial confidence in the essential soundness of the administrative determination. *(See, Matter of Evans v Monaghan, supra,* at pp 319-320; *Matter of Kelly v Murphy, supra,* at p 208; *Matter of Bernhaus v Ward, supra,* at p 201.)

We do not propose to delineate strictly those limited circumstances in which some measure of corroborative evidence must be adduced in administrative proceedings. Where, however, the charged misconduct is criminal in nature and the inculpatory testimony has as its source one who, in addition to holding himself out as an accomplice, possesses a clear motive to fabricate and a history of dishonest behavior raising the most serious questions as to his veracity or capacity therefor, the inherent danger of contrived testimony is too great to be countenanced. Exclusive reliance upon such testimony entails a risk of injustice which cannot be responsibly, or for that matter legally, entertained.

Our examination of the record in this matter persuades us that Officer Peteroy's substantially uncorroborated testimony did not provide a sufficient evidentiary basis for the determination under review. Moreover, considering the circumstances

under which Peteroy's testimony came to be offered, a high degree of corroboration was necessary. We are not of the view, apparently held by the dissenter, that there is any evidence in the record corroborative of Peteroy's allegations as to petitioner's misconduct. But, assuming, arguendo, that there is, it is not sufficient to command our confidence in the soundness of the determination at issue.

By all accounts, including his own, Peteroy was a "rogue cop". The following partial recapitulation of his all-encompassing dishonesty is uncontroverted in the record before us. Just two months after joining the police force in 1968, Peteroy began systematically to abuse his position of trust as a police officer to indulge in what can only be characterized as a career of thievery. On occasions too numerous to specify, but estimated by Peteroy at between two and three hundred, he stole money and property from the scenes of past burglaries to which he responded in his capacity as a police officer assigned to the 10th Precinct. During his testimony he noted but a few more recent examples of such conduct: in June 1979, Peteroy stole $1,000 from a camera store; in December 1980, he and his partner Gillott stole $1,000 from a pizzeria; also in December 1980, Peteroy burglarized a laundromat from which he took $200 and a private house from which he took silver coins whose worth he valued at $300; on January 31, 1981, Peteroy returned to the Rosenstock dealership (it will be recalled that the incident in connection with which petitioner is charged, allegedly occurred one week before on January 24, 1981) and stole automobile inspection stickers and stamps; in July 1981, Peteroy stole drugs and watches from a pharmacy; and in November and December 1981, respectively, Peteroy burglarized a Chinese vegetable store and a souvlaki stand.

Peteroy, by his own admission, was a compulsive gambler. In 1974, considerably before his betting activities reached their height, Peteroy was suspended for 10 days for being away from his post on some 40 occasions, mostly to engage in betting transactions. Although his thievery antedates his heaviest gambling, there can be little doubt that Peteroy's apparently insatiable need for cash, and with it his propensity for thievery, was largely fueled by his mounting gambling debts. At the peak of his gambling activity in 1978, Peteroy bet as much as $4,000 a week with bookmakers and had debts of over $30,000. He borrowed extensively both from legal lenders and loan sharks and his larcenous agenda became more ambitious, extending to off-duty burglaries. It was dur-

ing this period of heavy gambling indebtedness that Peteroy stole $1,400 from his off-duty employer, Rival Foods. Rival thereafter filed a complaint with the police department. When questioned by departmental investigative authorities Peteroy lied, denying his commission of the theft. He then sought psychiatric help, but not because he saw anything wrong with his behavior. As he put it, "I went to Psyche Services because I was in a jam, I didn't go because I had a gambling habit." Eventually, Peteroy received institutional treatment for compulsive gambling at a psychiatric center in Cleveland, Ohio. For a period afterward, he abstained from gambling, if not from thievery. His habit, however, revived in September 1980 and along with it, his need for still greater amounts of cash. In 1981, Peteroy, while off duty, burglarized a Porsche parts distributor and along with two other officers stole car radios with an estimated total value of $80,000.

It was during a gambling excursion to Atlantic City in June 1982 that Peteroy was finally arrested by the FBI. Since 1979 he had regularly received protection money from two "after hours" clubs in the 10th Precinct. For this practice, he was charged with violation of the Hobbs Act,[1] a Federal felony carrying a maximum prison sentence of 20 years. Shortly after his arrest Peteroy entered into an agreement with the prosecuting authorities. In exchange for his cooperation in the prosecution of other officers suspected of corrupt activity, Peteroy was to be allowed to plead guilty to a lesser offense. He was also promised that, as he put it, his "level of cooperation" with Federal, State and departmental prosecutors would be brought to the attention of the court at the time he was sentenced for the crime to which he entered his guilty plea.

Following the cooperation agreement, Peteroy began a period of involvement with the United States Attorney and the office of the Special Prosecutor. In January 1983, he was placed on "modified assignment" in the Manhattan Property Clerk's office with the understanding that he would be available to testify in Federal, State and departmental proceedings. In April of the same year, he was permitted to, and did, enter a plea of guilty to conspiracy to violate the Hobbs Act, a felony, but one which in contrast to the crime with which he

---

1. 18 USC § 1951, known as the Hobbs Act makes it unlawful for an individual to "obstruct * * * delay * * * or affect * * * commerce * * * by robbery or extortion" (subd [a]).

was initially charged, carried a maximum prison term of only five years. His conviction for a Federal felony thus established, Peteroy nevertheless was allowed to continue his employment as a police officer on "modified assignment" in plain contravention of Public Officers Law § 30 (1) (e) mandating the removal of public officers by operation of law upon conviction of a felony.[2]

About one month after his plea, Peteroy, still on "modified assignment", was debriefed by Detective Bertolino of the department Internal Affairs Division. Bertolino showed Peteroy a roster of 10th Precinct personnel, pointed to certain names, including petitioner's, and asked whether Peteroy had any disclosures to make concerning the officers indicated. It was then that Peteroy first made his allegations concerning petitioner's involvement in the subject burglary at Rosenstock. Bertolino destroyed his notes of the debriefing and testified that his subsequent reconstruction of Peteroy's account was inaccurate.[3] In any case, it is clear that Peteroy's initial recollection of the events at issue, said to have occurred some 2½ years before and concerning which he made no entries in his police memo book, was not altogether sharp. It is undisputed that in the months before petitioner's trial, while he was assigned to the Internal Affairs Division, Peteroy's memory was refreshed on certain points. Police reports of the numerous burglaries which occurred at Rosenstock were used to help Peteroy remember the date of the incident. To help him recall the time and the source of the call for backup at Rosenstock, he was shown a police department computer

2. Public Officers Law § 30 provides in relevant part:

"1. Every office shall be vacant upon the happening of one of the following events before the expiration of the term thereof * * *

"(e) His [the incumbent's] conviction of a felony, or a crime in violation of his oath of office".

Under both State and Federal law the entry of a guilty plea constitutes a conviction. (See, Matter of Gunning v Codd, 65 AD2d 415, affd 49 NY2d 495; see also, Boykin v Alabama, 395 US 238, 242; Kercheval v United States, 274 US 220, 223; Fluitt v Superintendent, Green Haven Correctional Facility, 480 F Supp 81 [SDNY 1979].)

3. In relevant part, Bertolino's reconstructed notes read: "115 10 Precinct 61#451—prepared by Police Officer Pizzo a complainant Mrs. Burns neighbor of Rosenstock Olds heard noises coming from an exhaust fan of premise 440 West 19th Street [the Rosenstock dealership]. 130 Peteroy stated that he was first on scene with Gillott approximately 0130 hours Sergeant Farry and Police Officer Pizzo arrived a short time later. 510 owner notified by Police Officer Pizzo at 0510 a.m. notified by ADT at 0520 a.m."

printout, known as a Sprint report, along with a written interpretation thereof by a department employee. His memory was refreshed as to the time the ADT employee arrived at the Rosenstock premises by the Department Advocate.

Petitioner was formally charged in November 1983 and his departmental trial took place in January 1984. At the time of the trial, Peteroy was still awaiting sentencing. He remained on "modified assignment" with the Internal Affairs Division, collecting a regular biweekly paycheck for rendering no other conceivable service than that of providing information and testimony concerning the misconduct of other officers.

In light of the foregoing, it should be clear why we consider corroboration of Peteroy's testimony essential to the legal sufficiency of the proof in this case. Here, we deal with a demonstrably corrupt and weak-willed individual, who on innumerable occasions during his some 16 years as a police officer, committed crimes whose victims were those he was sworn to protect. Repeatedly, Peteroy showed himself to be wholly unaffected by legal and ethical concerns or by any sense of fidelity to his duty as a police officer. He was governed instead by what can only be characterized as unreflective, and pathologically informed greed. A less trustworthy source can hardly be imagined, particularly in the circumstances here obtaining. At a time when Peteroy stood convicted of a felony and faced the possibility of a five-year prison term, he was asked specifically if he had any allegations of wrongdoing to make concerning petitioner. As noted, Peteroy was then under the impression that his "level of cooperation" would be brought to the attention of the sentencing Judge. He also could not have failed to understand that there was some relation between his usefulness to the Internal Affairs Division and his receipt of a biweekly paycheck. The possibility that Peteroy would purport to increase his "level of cooperation" by falsely accusing and testifying against another officer does not seem at all remote in these circumstances. His allegations of misconduct had, therefore, to be substantiated with the utmost care.

The dissent characterizes our concern as "exaggerated". It notes that Peteroy had no discernable grievance against petitioner and that Peteroy's extensive fund of "valid information" regarding the wrongdoing of other officers made it improbable that he would incur the risks entailed by fabrication. It is true that there is no indication in the record of any enmity between Peteroy and petitioner *(contrast, Matter of*

*Bernhaus v Ward,* 118 AD2d, at p 203). But the existence of a grievance is only one factor to be weighed in assessing the need for corroboration. Where, as here, there are other potent factors enhancing the likelihood of perjured testimony, a specific grievance to motivate the falsehood is not essential. In this connection, we observe that insofar as can be gathered from the record, Peteroy's recurrent resort to dishonesty was not in the main a product of personal animosity, but simply a means to a desired end. Peteroy had no identifiable dispute with those he stole from or lied to; for the most part, he took his victims as he found them.

It is, of course, true that it would have been imprudent for Peteroy to give false information and thereby risk increased penalties. Peteroy, however, was not a prudent man. He was a gambler who, always sure of his ability to "beat the odds" squandered large sums of money and ultimately his career and reputation. We have little difficulty believing that Peteroy would gamble on benefiting from a dishonest act or falsehood, giving little real heed to the possibility that he might be found out. That is, in fact, what he did over and over during his 16 years as a police officer. His willingness to entertain the most foolhardy risks was not diminished by his arrest.

Indeed, Peteroy admitted lying to Federal and State prosecuting authorities on several occasions even after his "cooperation" agreement. Incredibly, he also continued to receive protection money, the very activity for which he was arrested and eventually convicted. His confidence in his ability to manipulate and deceive was obviously immense and interfered in the most palpable way with any exercise of good judgment.

The dissent's observation that Peteroy had no reason to fabricate concerning petitioner since he had a wealth of "valid information" concerning criminal activity of many other officers, proceeds from a premise that finds little support in the record. We simply do not know what valid information Peteroy possessed about other officers. The record indicates that he testified in numerous proceedings, but the validity of the information provided by him is, on the present record, a matter for sheer speculation. Moreover, the actual number of officers Peteroy was in a position to implicate may have been far smaller than the number of burglaries and other crimes to which he admitted. Of the crimes specifically described by him, several were committed unassisted. In addition, to the extent that he acted with others, it is probable that he had a regular group of companions whose number was far less than

that suggested in the dissenting opinion. Finally, Peteroy withheld information and lied concerning the criminal involvement of those officers toward whom he felt some peculiar sense of loyalty; the very same officers who were apparently most deeply involved with him in illicit activity. Thus, Peteroy initially lied to protect his regular partner, Gillott. He also failed to disclose the participation of two officers in the above-discussed Porsche burglary, thereby allowing them to retire from the police department on their regular pensions. Obviously, Peteroy felt no such loyalty toward petitioner who, we gather, was not a regular companion of his.[4] The point to be made is that the number of officers about whom Peteroy may have had valid information was, in all probability, not only far more limited than the dissenter suggests, but was further limited by Peteroy's characteristic desire to manipulate circumstances to his satisfaction. Fabrication, we think, would have been perfectly acceptable to Peteroy as a device to advance his interests without jeopardizing those of his friends. It must be remembered that at the time Peteroy first mentioned petitioner's supposed involvement in the Rosenstock burglary, he wholly failed to disclose the involvement of his partner Gillott. We note with interest that as Peteroy eventually admitted, he and Gillott were present at the Rosenstock premises several hours before the incident at issue, at about 1:30 A.M., on what Peteroy termed "some sort of job". It is at about that time that the complaints received by the 10th Precinct and the reports of neighbors indicate that the original burglary at Rosenstock probably commenced.

Having made these observations, it is important to understand that we do not thereby conclude that Peteroy in fact lied concerning petitioner. What we do conclude is that there existed a sufficiently strong possibility of fabrication to trigger the need for corroboration as a matter of law. To his credit, the ACT understood that Peteroy's account required some substantiation, for he cited evidence which he felt supplied the necessary corroborative support. This evidence, however, was not, as might be expected, in the form of testimony from other witnesses to the alleged wrongdoing. We are given no clue as to why Officers Pizzo and Gillott who, as far as can be discerned from the record, were not charged in connection with the subject incident, were not called by the department

---

4. Petitioner and Peteroy only worked together once every six weeks and apparently had little contact apart from their work.

to testify. Rather, the evidence consisted of documents, and testimony from ADT employees Samuel Siegal and Francis Canavan, and from the owner of the burglarized dealership, Herbert Rosenstock. The combined testimony of these witnesses, along with supporting documentation, established that a burglary had in fact occurred at the automobile dealership sometime during the night of January 24, 1981; that among the items missing as a result of the burglary were parts taken from the dealership's parts department; and that the only alarm received from the Rosenstock premises by ADT during the night in question, emanated from the parts department at 5:00 A.M. From this, the ACT concluded that since the police were the only ones on the premises at 5:00 A.M., they must have triggered the alarm. This much is undisputed. The ACT, however, went further. He reasoned that since the only alarm received from the parts department went off at 5:00 A.M. that that was when the theft of the items from that area must have occurred, and that since only the police were present at that time, they must have committed the theft. This is perhaps a superficially appealing line of inferences, but it is not sustainable upon the record as a whole, much less is it "compelling" as the dissenter maintains.

The crucial question is not whether the parts department burglar alarm functioned at 5:00 A.M., but whether it was functioning until that point. If it was not, the parts department might have been burglarized undetected by the original burglars before 5:00 A.M. and the inference of wrongdoing which the ACT drew from the 5:00 A.M. alarm would be deprived of much, if not all, of its force. Ordinarily, one might infer that an alarm which functioned on one occasion would have functioned on a reasonably proximate earlier occasion if it had been triggered. That inference, however, is not a sound one given the peculiar circumstances with which we are here presented.

The testimony of the ADT employees indicated that the Rosenstock premises had two alarm systems: a perimeter system covering the outer doors and an interior series system covering the cashier's office and the parts department. It is undisputed that on the night in question, the perimeter system was not functioning and that the alarm in the cashier's office was out of order. ADT alarm installer Samuel Siegal, who responded to the 5:00 A.M. alarm and arrived at the Rosenstock premises at 5:18 A.M., testified that the only alarm which was "possibly" working was the alarm in the parts

department. Other testimony, apparently not considered by the ACT, indicated almost conclusively that the possibility that the parts department alarm functioned reliably prior to 5:00 A.M. was very slim indeed. This testimony indicated persuasively that the parts department had been previously entered and that no alarm was set off. The ACT inquired of Siegal "Do you remember what, if anything, you saw in the parts department?" Siegal replied, "I don't recall. *It looked like a bomb that is all*" (emphasis added).[5] As if oblivious to this response, the ACT inquired whether anything looked out of place! We are at a complete loss to understand how the police could have reduced the parts department to such a state of disorder in the time they had available to them. Far from corroborating Peteroy's testimony, Siegal's description of the total disarray he encountered in the parts department renders Peteroy's inherently improbable account all but impossible.

It will be recalled that the police arrived at Rosenstock and commenced their search at 4:50 A.M. According to Peteroy, they searched the upstairs together for about 10 minutes. At this point, or at about 5:00 A.M., they went downstairs and, after a brief discussion with a bystander, searched the entire lower level for between 10 and 15 minutes. It was Peteroy's testimony that only at this point, when they were sure they were alone on the premises, did the officers confer concerning which parts they could use. Thus, according to Peteroy, somewhere around 5:13, this being an extremely conservative estimate of the time, the officers started removing parts from the parts department and stacking them outside the door to the service area. We are not told how long this activity lasted, but are left with the impression that it must have taken several minutes because numerous items were transported and, as Peteroy indicated, petitioner had time to make a phone call while the others worked and then to help them by carrying a few cases of oil and some car batteries. Only after this was done was Pizzo sent to back the patrol car into the service area where the merchandise was loaded into the trunk. And only after the trunk was loaded did Peteroy and Gillott secure the garage door with a car from the second

---

**5.** Siegal's testimony it should be noted, was entirely consistent with his contemporaneous report of the situation at Rosenstock. ADT's records of the incident read in relevant part: "ASI [Siegal] states that the place was torn apart, *parts department,* and tools all gone. Cashiers room ripped apart. Also stated one car was missing from the floor" (emphasis added).

floor. Returning from this task, they encountered Siegal who, in Peteroy's words, had "just arrived on the scene". All concerned agree that Siegal arrived at 5:18 A.M. Even if we take the most indulgent view of Peteroy's testimony, making liberal allowances for imprecision in consideration of the fact that the testimony was given three years after the events alleged, we are completely unable to reconcile his account with the supposedly corroborative testimony supplied by Siegal.

If Peteroy's testimony is to be credited, the officers did not even begin to remove items from the parts department until, at the very earliest, between 5:10 and 5:15 A.M. Yet, Peteroy also testified that the theft was a *fait accompli* by the time of Siegal's arrival which indisputably occurred at 5:18. Even if we deduct substantially from the time Peteroy indicated was spent searching the premises, the officers would have been left a mere few minutes in which to confer, remove the items from the parts department, back the patrol car into the premises, load the trunk and secure the garage door. The difficulty involved in reconciling all this activity, which according to Peteroy occurred in sequence, with the exceedingly narrow time frame within which Peteroy testified it occurred, becomes nearly insuperable when two of Siegal's observations are taken into account. First, Siegal stated that upon his arrival, the patrol car was parked with its front end facing the parts department.[6] Thus, if it is true that, as Peteroy testified, the car was backed into the service area for convenient loading, the car would have had to have been turned around before Siegal appeared. This, however, adds yet another time consuming activity to those the officers supposedly accomplished in the very few minutes they had. Of substantially greater consequence, however, was Siegal's second observation, namely, that the parts department looked as if it had been the scene of a bomb explosion. To everything else the officers are said to have done in the time Peteroy's testimony indicated was available to them, we must then add their reduction of what the testimony of Herbert Rosenstock would lead us to believe was an orderly and well inventoried parts department, to a state of total disarray. The only alternative to this highly implausible conclusion is that the parts department was ransacked by the original burglars before the police arrived in

---

6. Petitioner explained that his patrol car had been driven into the dealership front first so that the headlights would illuminate the interior.

the same manner as they ransacked all the other areas of the dealership. Indeed, it is utterly incomprehensible that burglars would break into an automobile dealership and ransack all its areas except the one probably containing the most valuable merchandise. This is especially true in light of the fact that, as Peteroy testified, the parts department door was left unlocked. Moreover, as Peteroy expressly observed in answering a question posed by the Department Advocate, the original burglars stole many parts:

"Walsh [Department Advocate]: Officer, do you know what other property was stolen during the course of that burglary by the burglars?

"Peteroy: I don't know specifically. *I know it was a large amount of parts,* a couple of cars" (emphasis added). Presumably, the parts came from the parts department.

When we consider the record as a whole, the inference that the ACT drew from the 5:00 A.M. alarm seems almost entirely insupportable. We deal with an alarm system about which the most that can be said is that one of its components was possibly functioning. We note that the record shows that the Rosenstock premises were burglarized repeatedly both before and after the subject break-in of January 24, and that the alarm system was apparently ineffective on those occasions as well. On at least one such occasion, January 31, 1981, one week after the events in question, parts were once again successfully removed from the parts department. In addition to this general evidence of the alarm system's unreliability, we have noted the testimony of both Siegal and Peteroy indicating that the parts department was in fact entered and ransacked by the original burglars on January 24, 1981 and that the alarm system failed to give notice of their intrusion. We will not sanction the destruction of a man's career on the off chance that a temperamental alarm system was continuously functioning until 5:00 A.M. on the morning of January 24, 1981. At most, the testimony of the ADT personnel and Herbert Rosenstock establishes that a burglary occurred, and that the parts department was entered by the police at 5:00 A.M., as well it might have been during a routine search of the premises. This testimony cannot be fairly construed to corroborate Peteroy's allegations as to petitioner's wrongdoing. To the contrary, as we have observed, Siegal's testimony significantly undermines Peteroy's account of the theft.

The other supposedly corroborative evidence cited by the

ACT was the above-mentioned Sprint report said to indicate that Sergeant Grice (Sergeant 1), and not petitioner (Sergeant 2), initiated the call for backup at the Rosenstock premises. This bit of evidence does not prove or corroborate anything concerning the charged wrongdoing, nor does it even demonstrate the accuracy of Peteroy's recollection. Peteroy was shown the Sprint report and an interpretation of it by a departmental technician shortly before he testified. It is hardly surprising then that his memory, thus "refreshed", would agree with the interpretation of the report furnished by the departmental technician in his trial testimony. More to the point is whether Peteroy remembered anything at all. The official 10th Precinct roll call showed that Grice, who supposedly issued the 4:46 A.M. call for assistance at Rosenstock, was on his meal break from 4:00 until 5:00 A.M. He was never seen at the Rosenstock premises by Peteroy who claimed to have arrived there less than five minutes after receiving the radio message, or for that matter by anyone else. Grice was never called by the department to confirm whether he did in fact request assistance at Rosenstock at the time indicated in the Sprint report. Given the documentary evidence indicating that Grice was nowhere in the vicinity of the Rosenstock premises when the call went out, the impression we are left with is that Peteroy had little or no recollection of what caused him to proceed to the Rosenstock premises and simply repeated information he was given by the department before he testified. His recollection of the surrounding circumstances far from being "clear and consistent in all respects" as the dissenter suggests was altogether remarkable for its variability. For example:

"Scroope [counsel for petitioner]: Were you in fact, in front of the Fun House[7] [located at 526 West 26th Street] when you got this call (for back-up at Rosenstock)?

"Peteroy: That's a good possibility. I don't recall if we were."

A moment later the following exchange occurred:

"Scroope: You remember where you were when you got the call?

"Peteroy: Yes, I do.

"Scroope: Where were you?

---

7. The "Fun House" was one of the establishments from which Peteroy collected money.

"Peteroy: 18th Street and 9th Avenue."

Peteroy's recollection of the events attending his response to the radio call is further thrown into doubt by his prior inconsistent statement to Detective Bertolino *(see,* n 3, *supra).* Although Bertolino, after listening to Peteroy testify, took the witness stand to explain that his notes of Peteroy's debriefing were mistaken, he, nevertheless, reiterated that, as his notes stated, Peteroy told him that he arrived at the dealership *before* petitioner. After Peteroy's memory was "refreshed" he, of course, testified that it was petitioner who arrived first. When considered in light of the record as a whole, the so-called corroborative evidence leaves us with the unpleasant impression that Peteroy's memory was not so much refreshed as it was reconstituted during his lengthy and illegal assignment to the Internal Affairs Division following his felony conviction.

Although the contrary conclusion may seem to follow from what we have said, the foregoing review of the testimony adduced at petitioner's trial, was not undertaken to demonstrate that Peteroy was an incredible witness. Our more limited objective has been to show that the supposedly corroborative evidence did not in fact corroborate Peteroy's account of petitioner's wrongdoing. We do not here intend to supplant the proper function of the Hearing Officer and make ultimate credibility determinations. Hence, we do not say that petitioner testified truthfully or even that Peteroy testified untruthfully. All we hold is that given the circumstances under which Peteroy came to testify, his testimony required firm corroboration if there was to be a sufficient evidentiary basis for the determination. The absence of such corroborative support fatally undermined the determination, even if Peteroy may have seemed to testify truthfully. We reiterate that the circumstances under which substantial evidence will entail some measure of corroboration are very limited. The offense charged must involve criminality and the motive for fabrication on the part of the witness giving the incriminating testimony, must be clear. The critical determination is whether exclusive reliance upon certain incriminating testimony creates a substantial danger of injustice. This determination must be made upon the record as a whole, particularly as it bears on the circumstances under which the testimony came to be offered. The defect in the proceeding under review was not the ACT's failure to appreciate, in principle, the importance of corroborative evidence but in his practical

failure to point to any such evidence sufficiently supportive of Peteroy's testimony. It is on this basis that we find it necessary to annul the determination under review.

Accordingly, in this CPLR article 78 proceeding transferred to this court by order of the Supreme Court (Alfred M. Ascione, J.), entered March 27, 1985, the petition should be granted and the determination of the Police Commissioner, Benjamin Ward, dismissing petitioner Sergeant Richard D. Farry from the Police Department of the City of New York, effective September 24, 1984, should be annulled, without costs.

SANDLER, J. (dissenting). The facts developed at the departmental hearing are comprehensively set forth in the court's opinion, although in some respects the manner of their presentation seems to me to obscure the reality of the events. In my opinion, the determination of the Assistant Commissioner of Trials (ACT) that petitioner had participated with other police officers in the theft of property at the Rosenstock Oldsmobile dealership following a burglary earlier on the same morning is supported by substantial evidence. After a careful study of the record, I see very little basis for the concern of my colleagues that the determination challenged in this CPLR article 78 proceeding may have constituted an injustice.

The principle is, of course, well established that in administrative hearings the credibility of witnesses is primarily a matter for the Hearing Officer, and not for an appellate court. *(See, Matter of Collins v Codd,* 38 NY2d 269; *Matter of Stork Rest. v Boland,* 282 NY 256, 267.) In *Sierra v McGuire* (60 NY2d 720, *revg* 91 AD2d 179), the Court of Appeals reversed, for the reasons stated in the dissenting opinion, a determination in a disciplinary proceeding in which, as in this case, the court substituted its judgment on issues of credibility for that of the Hearing Officer. In his opinion (at p 187), the dissenting Justice (Alexander, J.) quoted the familiar words of Chief Judge Lehman in *Matter of Stork Rest. v Boland (supra,* at p 267): " ' "[w]here there is conflict in the testimony produced * * * where reasonable men might differ as to whether the testimony of one witness should be accepted or the testimony of another witness be rejected, where from the evidence either of two conflicting inferences may be drawn, the duty of weighing the evidence and making the choice rests solely upon the [administrative agency]. The courts may not weigh

the evidence or reject the choice made * * * where the evidence is conflicting and room for choice exists" ' ".

Accepting that there nonetheless exists some limited power for this court to substitute its judgment for that of the ACT on issues of credibility, I see no basis in this record for disturbing the findings reached by the ACT after a hearing conducted with conspicuous fairness and ability, and embodied in a decision that manifests a careful, conscientious and thoughtful evaluation of the evidence.

Viewed dispassionately, the record discloses no plausible basis for an appellate court to conclude that Peteroy's testimony was manifestly incredible or incredible as a matter of law. On the contrary, considering that Peteroy was testifying with regard to events that occurred some three years before the hearing, his testimony was clear, consistent in all essential respects, and thoroughly believable. In particular, Peteroy's detailed account of the circumstances under which the stolen property was transferred from petitioner's vehicle to the van of another officer at a prearranged meeting time and place, and his account of how the stolen property was thereafter apportioned at a later time bears unmistakable indicia of authenticity.

By any standard, Peteroy's account is far more persuasive than that of petitioner, whose principal remembrance of the events appeared to be the convenient one that he was on the phone much of the time, and who did not remember whether or not he had entered the parts department.

The conclusion in the court's opinion that the removal of items from the parts department did not commence until somewhere between 5:10 and 5:15 A.M. represents a conspicuously unrealistic interpretation of the evidence. Whatever may have been Peteroy's memory with regard to events occurring years earlier as to when the police arrived, and how much time was taken in one or another of their activities, it is clear from the triggering of the parts department alarm at 5:00 A.M. that the police entered that department at that time. When that pivotal fact is considered together with Peteroy's testimony as to the brief discussion that then ensued, it is clear that the removal of items from the parts department began within a minute or two after the police entry into that department. Certainly the ACT could have reasonably so concluded.

Accepting as a minimum that such a finding could reason-

ably have been made by the ACT, there is nothing in the other evidence to support the conclusion that the thefts could not have occurred prior to the arrival of others, or that there was insufficient time for the vehicle into which the stolen property was placed to have been removed to a less suspicious location.

Moreover, the record discloses no effort on behalf of petitioner even to suggest a grievance on the part of Peteroy towards him that might explain why Peteroy would have singled him out to accuse him of participating in a police crime that never took place. Nor does it disclose any suggestion of a grievance by Peteroy to explain his accusing the other two officers of participation in this "manufactured" crime, one of them his long-term partner whom Peteroy had tried to protect by withholding his name as a participant in criminal activities for months during Peteroy's period of cooperation with the authorities.

In the long litany of Peteroy's misdeeds painstakingly detailed in the court's opinion, almost all of which are based on Peteroy's own admissions of misconduct, I do not find a scintilla of support for the conclusion that Peteroy is someone who is likely to give false inculpatory testimony, and to do so repetitively, with regard to persons as to whom he had no grievance, knowing that his false testimony would inflict incalculable harm on these individuals and their families. Quite the contrary is clearly disclosed by the record. As the evidence described in the court's opinion indicates, Peteroy on several occasions, at a considerable risk to himself, withheld information with regard to the misconduct of others in an effort to protect them. In any event, the issue of his credibility was one for the ACT, and it was an issue that the ACT could reasonably have resolved as he did.

Nor do I see any deficiency in this case arising from the failure of the department to call the other two police officers whom Peteroy had identified as participants in the criminal activity, one of them his former partner, an officer against whom he had testified in a prior disciplinary proceeding. Nothing in the record suggests that the department could reasonably have expected these two officers to testify about their own criminal conduct, or supports the suggestion that the failure to call them to so testify in some way impairs Peteroy's credibility. Although the failure of petitioner to call these witnesses would not in my view be an appropriate circumstance to consider against petitioner, it surely would

have made far more sense, if no police crime had in fact occurred, for the uncalled witnesses to have testified on behalf of petitioner to deny the testimony which implicated them, no less then petitioner, in a criminal act.

Finally, the essential accuracy of Peteroy's testimony was solidly confirmed by undisputed documentary evidence establishing that the only occasion on which an alarm was triggered on the morning of the burglary was when the interior alarm safeguarding the parts department was set off at 5:00 A.M., at a time when the police, and only the police, were present. The evidence concerning the alarm strongly supports the conclusion that the burglars never entered the parts department, and therefore could not have removed that which was found to have been stolen from that department.

The operations manager of ADT Security Systems, which provided burglar alarms protection for the premises, and another ADT employee who responded to the premises on the morning in question, both described in detail the alarm system as it then existed. The system embraced two types of protection, a perimeter alarm system that covered the outer entranceways to the premises including the doors, overhead doors, garage doors and employee entrances, and a system variously described as an interior or series alarm system that covered the cashier's office and parts department. As amplified by the operations manager, the interior system protecting the parts department was so arranged that it would be triggered by opening the door to that department, and if for some reason the opening of the door did not break the contact on the door, the alarm would be independently triggered by someone walking inside the area.

From the testimony of the witnesses it is clear that the perimeter system was not functioning on the morning in question, and it is also clear, although this was not the subject of explicit inquiry, that the interior alarm protecting the cashier's office was not functioning on that morning. But the fact that parts of the alarm system were not functioning does not derogate from the significance of the indisputable fact that the interior alarm protecting the parts department was functioning at 5 o'clock in the morning, and the inference to be drawn from that fact that it had been functioning at the time of the burglary, and would have been triggered if the burglars had entered the parts department. Whether that inference be considered reasonable or, as I believe, compelling, it provides

strong corroboration for Peteroy's testimony, assuming that any such corroboration is required.

I am not an expert on the functioning or malfunctioning of alarm systems, and am prepared to accept, although the record discloses no basis for this phenomenon, that there may be occasions in which a particular alarm unit does not function at one period of time, and without any adjustments or repairs, suddenly starts to function a few hours later. In the absence of any expert testimony to the contrary, it is surely a reasonable inference that this circumstance is extremely unusual, and that it would be particularly unusual, assuming the original burglars had entered the parts department, that they could have been moving around inside it for some period of time without triggering an alarm designed to go off upon the movement of individuals within that department.

The compelling confirmation of Peteroy's testimony manifest in the functioning of the alarm system does not seem to me significantly undermined by the testimony of Siegal, with regard to the parts department, that "it looked like a bomb".

Apart from the possibility that this comment may have reflected an exaggerated recollection of an observation made some years before, I find no difficulty in the thought that four men engaged in a criminal act, and acting with some sense of urgency, were quite capable of making quite a mess of the area in their search for parts to meet their individual requirements.

What seems to me to underlie the court's determination in this case is a concern that a repetitive criminal, arrested in connection with one of his crimes and under pressure to cooperate with regard to other wrongdoers to mitigate his sentence, may be motivated to accuse others of crimes that they did not in fact commit. This concern is surely one to be weighed by the fact finder together with all the relevant facts and circumstances bearing on the testimony. I see no reason to believe that in this case the ACT did not carefully and fairly evaluate all of the relevant circumstances bearing on the issue of credibility.

Moreover, the concern implicit in the court's opinion seems to me, at best, exaggerated under the circumstances presented. This is not a case in which there is any reason to suppose that the witness had little, if any, authentic information to give with regard to wrongdoing by others and therefore was under severe pressure to assist himself by falsely charg-

ing others. Peteroy admitted, and there seems no reason to doubt this admission, that he had participated in hundreds of crimes during his police career. Some 200 of these crimes were of the type that was the subject of this disciplinary proceeding, in which he and other police officers responded to completed burglaries, and appropriated to themselves some of that which had been left behind by the burglars. From the nature of these crimes, and their number, it is obvious that Peteroy had valid information with regard to the criminal activities of many other police officers.

Assuming that it were appropriate for this court to undertake such an evaluation, it would seem to me at best doubtful that Peteroy would have undertaken the extremely risky course of adding to the accurate information that he gave with regard to other police officers false information accusing innocent officers of criminal conduct, knowing as he must that some unexpected, or forgotten, fact might conclusively refute his false charges and subject him to enormously increased penalties.

Accordingly, the petition should be dismissed and the determination of the respondent dated September 24, 1984, finding petitioner guilty of 2 of 4 disciplinary charges and dismissing him from the police department, should be confirmed.

KASSAL and WALLACH, JJ., concur with MURPHY, P. J.; SANDLER, J., dissents in an opinion.

Determination of respondent Police Commissioner dated September 24, 1984, annulled, without costs and without disbursements.